A11A2264. MATTHEWS v. DUKES et al.
A11A2265. DUKES v. MATTHEWS.
(726 SE2d 95)

BOGGS, Judge.

We granted these discretionary applications to consider the trial court's rulings in this legitimation action. The trial court did not err in denying appellant Kevin Matthews' legitimation petition, determining that Matthews had lost his opportunity interest in becoming the child's legal father, and finding that legitimation was not in the best interest of the child. The trial court also did not abuse its discretion in entering a no-contact order with respect to Matthews. We therefore affirm in part. The trial court erred, however, in ordering Matthews to pay child support, and we therefore reverse that portion of the court's order.

The facts as found by the trial court show that immediately after Amy Dukes ("the wife") married James Dukes ("the husband") in 2003, she began an affair with Matthews, who was also married to another.[1] In 2005, the wife became pregnant, and suspected that Matthews might be the father. She informed the husband, but falsely told him "that she'd had a one-time sexual encounter with him and that it was over." The husband testified, and the trial court found that the husband "has provided for all the child's needs" and the husband, wife and child "have lived together as a family continuously since the birth of the child."

The wife testified that, after the child was born, she and Matthews arranged for a DNA test — under false names — and discovered that Matthews was the child's biological father.[2] They did not, however, inform the husband. Matthews did not take any legal steps at that time to acknowledge or legitimate the child. Instead, Matthews saw the child when the wife met him secretly at the marital residence, Matthews' home, and other places where they believed they would not be recognized. These meetings included sex in the marital home while the child was there. Matthews also brought the child of his own marriage along to meetings outside the marital residence. Matthews testified that he gave the wife cash and purchased some toys and clothes for the child over a period of five

---

[1] At the time of the hearing in 2011, Matthews remained married to his wife, although they had been separated for approximately one year.

[2] The wife and Matthews later tested the second child of the marriage, and determined that she was the daughter of the husband and the wife.

years. He provided receipts for approximately $250 worth of clothes and toys. He believed that he had also purchased "a few more pull-ups and a few cans of formula" although he had no receipts, and he let her borrow some used clothing and equipment that his daughter had used. He acknowledged that he had not provided any substantial support for the child.

In 2010, the husband discovered that Matthews was seeing the child when the child complained that Matthews had pushed him down and hurt his arm. Suspicious of the wife's behavior while she was on the family computer, the husband investigated and found numerous e-mail exchanges between the wife and Matthews that revealed their years-long affair. He instructed his wife to stop Matthews' contact with the child; she did not immediately comply, but eventually the visits ceased. Only then did Matthews bring this action seeking to legitimate the child. As the trial court found, neither the husband nor the wife expressed an intent to end the marriage.

The trial court held a hearing at which all parties presented evidence and testimony. After the hearing, the trial court entered an order denying the petition to legitimate, finding that Matthews had lost his opportunity interest in becoming the father of the child and that it was not in the best interest of the child for Matthews to become the legal father. In addition, the court ordered Matthews to stay 500 yards away from the child unless he obtained written permission from the father and ordered Matthews to pay child support in the amount of $538 per month until the child was 18 years old, "unless earlier emancipated." In Case No. A11A2264, Matthews appeals from the trial court's order, asserting six enumerations of error. In Case No. A11A2265, the wife appeals from the trial court's order, asserting two enumerations of error.

## Case No. A11A2264

1. We first consider whether the trial court erred in denying Matthews' petition for legitimation under OCGA § 19-7-22. Most legitimation cases apply an "opportunity interest" test derived from the Supreme Court of Georgia's decision in *In re Baby Girl Eason*, 257 Ga. 292 (358 SE2d 459) (1987).

> Before granting a petition to legitimate, the court must initially determine whether the father has abandoned his opportunity interest to develop a relationship with the child. Then, depending on the nature of the putative father's relationship with the child and other surrounding circumstances, the standard for evaluating whether legiti-

mation is appropriate is either a test of his fitness as a parent or the best interest of the child.

A biological father's opportunity interest begins at conception and may endure through the minority of the child, but it may be abandoned by the unwed father if not timely pursued. On the other hand it is an interest which an unwed father has a right to pursue through his commitment to becoming a father in a true relational sense as well as in a biological sense. Factors which may support a finding of abandonment include, without limitation, a biological father's inaction during pregnancy and at birth, a delay in filing a legitimation petition, and a lack of contact with the child.

(Citations, punctuation and footnotes omitted.) *Morris v. Morris*, 309 Ga. App. 387, 388-389 (2) (710 SE2d 601) (2011). "If the trial court concludes that the father has abandoned his opportunity interest, that finding is sufficient to end the court's inquiry and justifies the denial of the legitimation petition." (Citation and punctuation omitted.) Id. at 389 (2), n. 5.

But a different standard applies where, as here, a petitioner is not attempting to legitimate a fatherless child as against unrelated third parties, such as the potential adoptive parents in *Eason*, but rather seeks to delegitimate the presumptively legitimate child of a marriage and thus to destroy an existing, legal parent-child relationship, as in *Baker v. Baker*, 276 Ga. 778, 781 (582 SE2d 102) (2003). There, the Supreme Court relied upon *Davis v. LaBrec*, 274 Ga. 5, 7-8 (549 SE2d 76) (2001), in which the child had been legitimated pursuant to OCGA § 19-7-22, and *Ghrist v. Fricks*, 219 Ga. App. 415, 420-421 (1) (465 SE2d 501) (1995), in which the child was, as in *Baker*, the presumptively legitimate offspring of a marriage. These cases are distinct from *Eason* and its progeny because in *Baker*, *Davis*, and *Ghrist*, the child had a legal father and a "legally recognized family unit already in existence." (Citation, punctuation and footnote omitted.) *Baker*, supra, 276 Ga. at 780 (2). Such cases involve the strong public interest in supporting marriage and the family, as well as the presumption of legitimacy found in OCGA § 19-7-20 (a).

The public policy of this state favoring the institution of marriage and the legitimacy of children born during a marriage is the strongest public policy recognized by law. This court's holding . . . that all children born in wedlock or within the usual period of gestation thereafter are legiti-

mate, but the legitimacy of such a child may be disputed; where possibility of access exists, the strong presumption is in favor of legitimacy and the proof must be clear to establish the contrary, citing OCGA § 19-7-20 (a) and (b), is but one of the latest of a long series of decisions rendered by the appellate courts of Georgia recognizing this public policy and evincing the commitment of Georgia's courts to enforcing it. This presumption of legitimacy is one of the strongest and most persuasive known to our law. Moreover, this statutory presumption is a *firmly-established* principle of law, evincing a strong state policy favoring marriage and legitimacy.

(Citations and punctuation omitted; emphasis in original.) *Ghrist*, supra, 219 Ga. App. at 418 (1).

In such a situation, our Supreme Court has declared that the "best interests of the child" standard should apply to any attempt to attack the presumption of legitimacy:

[W]e believe it is not contradictory to say that although the Code provides the means for the presumption of legitimacy to be rebutted, the trial court should consider the child's best interests when deciding whether to permit the legal father's status to be challenged by a rebuttal of the presumption of legitimacy. The law allowing the presumption of legitimacy to be rebutted was never intended to sever a child's ties with his or her legal father. In fact, the Code sections . . . were primarily intended to provide for the establishment rather than the dissolution of legitimacy and paternity. Moreover, our public policy will not permit a [petitioner] to enlist the aid of the courts to disturb the emotional ties existing between a child and his legal father after sitting on [his] rights for the first phase of the child's life.

(Citations, punctuation and footnotes omitted.) *Baker*, supra, 276 Ga. at 782 (3). Here, "[i]t is undisputed that [the husband] and the child have formed deep familial and psychological bonds that stem from the emotional attachments that derive from the intimacy of daily association." (Citations and punctuation omitted.) *Davis*, supra, 274 Ga. at 7.

Put another way, cases such as these can be seen as concluding that the public policy of our state forbids the assertion of an *Eason* "opportunity interest" by a third party whose adulterous conduct has resulted in a presumptively legitimate child being born within an

existing family — at least when that third party knowingly and fraudulently conceals his involvement from the legal father and takes no steps to claim the child as his own. Even the dissent in *Baker*, while objecting to the use of the majority's analysis in the context of a divorce action, recognized that it was appropriate when fraud was involved, especially when "both biological parents engaged in fraudulent conduct regarding paternity while maintaining a years-long adulterous affair." (Citation omitted.) 276 Ga. at 785 (Benham, J., dissenting). Such is precisely the situation here, and "this Court will not relieve parties of the consequences of their own fraudulent conduct. [Cit.]" *Patterson v. Whitehead*, 224 Ga. App. 636, 639 (3) (481 SE2d 621) (1997) (citing *Ghrist*, supra).

Even if we assume that Matthews had some form of opportunity interest in delegitimating a legitimate child and destroying an intact family, an analysis of the factors outlined in *Morris*, supra, 309 Ga. App. at 389 (2), shows that the trial court correctly concluded that Matthews has abandoned any such interest. He took no action during the wife's pregnancy or birth, and he never sought to legitimate the child, even after he received the results from the secret DNA test, until almost five years after the child's conception and only after his surreptitious contact with the child was cut off. Compare id. at 390 (2) (putative father participated in doctor visit, went to hospital, provided home and medical insurance for mother, and petitioned for legitimation within two months of child's birth).

Both Matthews and the wife argue that Matthews pursued his opportunity interest by meeting with the child during the course of their affair and by giving the wife cash and making purchases for the child.[3] But occasional visits with and small gifts to the child do not alter the conclusion that he abandoned his "opportunity interest" within the meaning of *Eason*. In the absence of a legal, public, or unconcealed assertion of any opportunity interest, Matthews has lost any such interest he may have had.

The trial court's ruling on a legitimation petition is reviewed for abuse of discretion only. *Morris*, supra, 309 Ga. App. at 389 (2). Moreover, "factual findings made after a hearing shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses. The appellate courts will not disturb fact findings of a trial court if there is any evidence to sustain them." (Citation and punctuation omitted.) *Harris v. Williams*, 304 Ga. App. 390, 390-391 (696 SE2d

---

[3] The husband questions whether the wife has any standing to assert the denial of Matthews' legitimation petition as error. We need not consider that question because we find no error here in any event.

131) (2010). Under the circumstances presented here, the trial court did not err in denying Matthews' legitimation petition.

2. Matthews also argues that because the denial of his legitimation petition is, in effect, a termination of his parental rights, the case therefore should have been transferred to juvenile court. This contention is without merit. See *Ghrist*, supra, 219 Ga. App. at 421 (2) (paternity and legitimation action not termination action, and issue of putative father's rights ancillary to paternity and legitimation issues).

3. We next consider the trial court's entry of a no-contact order with respect to Matthews. Even in a dispute between legal parents, in deciding

> the issue of custody of a child, which includes visitation, the trial court has very broad discretion, looking always to the best interest of the child. When the trial court has exercised that discretion, this court will not interfere unless the evidence shows a clear abuse of discretion, and where there is any evidence to support the trial court's finding, this court will not find there was an abuse of discretion.

(Citations and punctuation omitted.) *Taylor v. Taylor*, 282 Ga. 113, 114 (1) (646 SE2d 238) (2007) (divorce decree denying any visitation with husband supported by some evidence and not abuse of discretion). Similarly, if a legitimation petition is granted, the trial court has discretion with respect to visitation, considering the best interests of the child. OCGA § 19-7-22 (f.1).

In addition, a trial court has the inherent power to craft such conditions as will enforce its orders.

> The inherent power of courts to enforce their orders is grounded in both the [C]onstitution and the Official Code of this state. Under OCGA § 15-1-3 (3), every court has the power to compel obedience to its orders. And the Georgia Constitution provides that each court may exercise such powers as necessary in aid of its jurisdiction or to protect or effectuate its judgments. Ga. Const. Art. VI, Sec. I, Par. IV. This court will not undertake to control the wide discretion vested in the trial court in the exercise of this fundamental power unless it is made to appear that wrong or oppression has resulted from an abuse of such discretion reposed in the court. Moreover, where equity acquires jurisdiction for any purpose it will retain jurisdiction to give full and complete relief, whether legal or equitable, as to all purposes relating to the subject matter.

(Citations, punctuation and footnote omitted.) *Clark v. Chapman*, 301 Ga. App. 117, 119 (687 SE2d 146) (2009). And a court is constitutionally authorized to "take action to protect the efficacy of its judgment from a party's actions that endanger that judgment. [Cits.]" *Felix v. State*, 271 Ga. 534, 537 (523 SE2d 1) (1999).

Here, bearing in mind these principles and the strong interest of the State of Georgia in preserving intact families and defending marriage and legitimacy, we consider the evidence presented to the trial court. The trial court has determined that Matthews has no legal relationship with the child, and we have affirmed that determination. But Matthews has demonstrated repeatedly over a period of years that he has no respect for marriage or the family, and he has not taken responsibility for his actions or considered any potential harm to the child from his conduct. Moreover, as the trial court noted in its order, Matthews has been hostile and confrontational with the husband. The trial court was authorized to protect the child and the family from interference and the resulting confusion and harm to the child.

The trial court was also authorized to give certainty to its no-contact order by including a requirement for written permission from the father in the order. Otherwise, the mother could render the order of no effect by taking the child to see Matthews as she has in the past, thus arguably giving consent to the forbidden contact. See, e.g., OCGA § 16-5-91 (a) (violation of protective order must be without consent). Under these circumstances, the trial court did not err in entering a no-contact order with respect to Matthews.

### Case No. A11A2265

4. In Case No. A11A2265, the wife complains that the court's no-contact order violates *her* right as the mother to determine her child's associations and companions. But her illegal and fraudulent conduct, as well as that of Matthews, contributed to the situation in which she now finds herself. And her position has not been constant or consistent. Although initially she gave an affidavit stating that she did not want the child to have contact with Matthews, at the hearing she stated that she had changed her mind, although she was unable to articulate any clear reason for having done so. She continues to assert her desire for Matthews to legitimate the child and for the child to have contact with Matthews, although she joins his appeal of the award of child support.

The trial court could reasonably conclude from the evidence presented that the wife is unable to stay away from Matthews of her own volition, despite claiming that "I don't break up marriages," acknowledging that "it couldn't go on the way it was," and com-

plaining that it was "very stressful" for her to keep up the affair. She continued to have sexual intercourse with Matthews even after being served with the petition in this case and two months before the hearing. She involved her child in the relationship as well, only stopping because, by her own testimony, the child "is now talking and he's going home and he's telling, you know, [the husband] oh, I saw Kevin today, you know." In addition, evidence was presented that when the child complained that Matthews pushed him down and hurt his arm, the wife told her husband that the child "made it up."[4] The evidence and testimony show that the wife placed her illicit relationship with Matthews before the best interest of her child, to the child's detriment. Her belatedly expressed concern at the hearing that the child may be "devastate[d]" or "hurt" if he someday learns who his "real father" is does not comport with her previous actions.

The paramount concern of the courts is to consider the best interests of the child and to protect that child from harm to those interests, if circumstances require it. As we noted in Division 3, supra, the trial court did not abuse its discretion in concluding from the evidence presented that the continued presence of Matthews, with a lengthy history of misconduct, subterfuge, and improper influence over the wife, was harmful to the child both directly and indirectly as a threat to the integrity of the child's family and "the emotional ties existing between a child and his legal father." *Baker*, supra, 276 Ga. at 782 (3).

5. The trial court erred, however, in requiring Matthews to pay child support after denying his petition for legitimation.[5] The trial court reasoned that paternity is separate from legitimation and support may be ordered despite lack of legitimation. But, as we noted in Division 1, above, this is not a typical legitimation proceeding, nor is it a paternity suit. Matthews' petition sought not to provide a father — and hence a father's support — to a fatherless child, but "to, in effect, render the legitimate child illegitimate." *Ghrist*, supra, 219 Ga. App. at 418 (1). And "[t]he statutes do not contemplate a

---

[4] This is not, as Matthews asserts, hearsay, as it was not submitted to prove the truth of the matters asserted: whether the child was injured by Matthews or whether the child "made it up." See, e.g., *Wright v. State*, 302 Ga. App. 101, 104 (3) (690 SE2d 220) (2010). Rather, it demonstrates the wife's willing participation in the concealment of both her affair with Matthews and Matthews' contact with the child, as well as her stated motivation for ending contact with Matthews because the child was beginning to talk.

[5] Although acknowledging that the right of support belongs to the child and may not be waived by a parent, see *Worthington v. Worthington*, 250 Ga. 730, 731 (1) (301 SE2d 44) (1983), the husband does not oppose Matthews' argument, stating that his "first and foremost desire is for the cessation of any and all contact between the Appellant Kevin Matthews and every member of his family, particularly with his son . . . . [He] is fully capable of financially supporting his son without any assistance from anyone else, especially Mr. Matthews."

child having two legal fathers." *In the Interest of C. L.*, 284 Ga. App. 674, 676 (1) (644 SE2d 530) (2007) (grant of legitimation petition substituted biological father for legal father and former legal father could not seek custody). This is certainly also true when the legitimation petition has been denied: a biological father who has not been permitted to legitimate a child may not usurp the legal father's obligation and duty to support his child.

Here, Matthews was never determined to be the legal father, and because of the unusual circumstances presented here, he had no opportunity interest in claiming paternity of the legitimate child of an intact family. No legal basis exists for an obligation to support the child, and the trial court therefore erred in ordering Matthews to pay child support.

*Judgment affirmed in part and reversed in part. Mikell, P. J., and Dillard, J., concur.*

DECIDED MARCH 14, 2012.

*Capers, Dunbar, Sanders, Bruckner & Bellotti, Amanda M. Bellotti*, for Matthews.

*James M. Spence, Lisa L. Clarke*, for Dukes et al.